## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| M.D.,[1] J.B., P.P, and JANE DOES 1-100 | C/A No. |
| PLAINTIFFS, | |
| v. | **PROPOSED FIRST AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| LOUISIANA BOARD OF REGENTS, LOUISIANA STATE UNIVERSITY BOARD OF SUPERVISORS, UNIVERSITY OF LOUISIANA SYSTEM BOARD OF SUPERVISORS, LAFAYETTE CONSOLIDATED GOVERNMENT, LAFAYETTE POLICE DEPARTMENT, JOSEPH SAVOIE, LES GUICE, FIELDON KING ALEXANDER, TOM GALLIGAN, WILLIAM F. TATE, TOBY AGUILLARD, and JOHN/JANE DOE CHIEFS OF POLICE, | |
| individually and in their official capacities, | |
| DEFENDANTS, | |

## <u>INTRODUCTION</u>

1.     Throughout his roughly six-year tenure as a student at universities across Louisiana, Victor Silva left a wake of sexual assault allegations and victims – yet never missed a semester. This action seeks answers and redress for the failures by multiple universities and law enforcement to protect students on university campuses from sexual misconduct and harm.

2.     This is an action for damages to recognize past failures, and to prevent future victimization and abuse against Plaintiffs, and those similarly situated, who relied upon these

---

[1] For privacy, Plaintiffs will only be identified by initials.

public institutions, and agencies to protect them, but were misled or otherwise disregarded by these same entities.

3.       The conduct of the Defendant Institutions, Individuals, and Agencies is particularly egregious in light of a law passed by the Louisiana legislature in 2015, Act 172, which was expressly designed to prevent sexual abuse on college campuses, by mandating communication, cross-training, and coordination between Louisiana's public post-secondary institutions and law enforcement.

4.       Passed in recognition of the prolific sexual assault problem present on Louisiana post-secondary campuses, Act 172, which applied to every institution receiving Title IX funds, mandated universities to enter into a Memorandum of Understanding with local law enforcement creating investigation and information sharing protocols and procedures related to sexual offenses and offenders.

5.       Act 172 also required mandatory training by the Louisiana University Board of Regents for any institutional employee or individual involved in the sexual assault and misconduct grievance process.

6.       Yet, as set forth herein, during the operative timeframe, despite the existence of resources, training, policies, and procedures, and despite the fact that each of the Universities named in this complaint continued to receive Title IX funds, the Universities, Law Enforcement Entities, and Supervisory boards named herein, by and through their various agents, and/or authorized representatives, including the University Presidents, failed to abide by the Requirements of Act 172, resulting in dangerous on-campus environments, where students were promised safety, when, in reality no effort was taken to keep these students safe.

## **PARTIES**

7.      At all times relevant to this complaint, Plaintiff M.D. has been a resident of Atlanta, Georgia. At the time she was victimized by Victor Silva, she was a student at Louisiana State University.

8.      At all times relevant to this complaint, Plaintiff P.P. has been a resident of Louisiana. At the time she was victimized by Victor Silva, she was a student at the University of Louisiana.

9.      At all times relevant to this complaint, Plaintiff J.B. has been a resident of Arkansas. At the time she was victimized by Victor Silva, she was working for a private employer, where Victor Silva was also employed.

10.      At all times relevant to this complaint, Jane Does 1 through 100 were students at the Defendant Universities, who were victims of sexual assault and/or misconduct, including by Victor Silva, and whose reports went unprosecuted, and/or whose assailants were never appropriately sanctioned.

11.      At all times relevant to this complaint, Defendant Louisiana Board of Regents ("Defendant Board of Regents") has been a state agency, organized and existing pursuant to Louisiana law. Formed in 1974, the Board of Regents is responsible for coordinating all aspects of university life for Louisiana public post-secondary education. One of Defendant Board of Regents' fundamental roles is oversight, input and/or control over the annual budget of Louisiana's public post-secondary institutions. As such, Defendant Board of Regents had the ability to and did exercise control over the individual University Defendants as set forth more fully herein.

12.      At all times relevant to this complaint, Defendant Louisiana State University Board of Supervisors ("Defendant LSU Board of Supervisors") has acted as the governing body of

3

Louisiana State University, a public post-secondary institution organized and existing pursuant to Louisiana law.

13.    At all times relevant to this complaint until January 2020, Fieldon King Alexander ("Defendant Alexander") was the President of Louisiana State University.

14.    At all times relevant to this complaint from January 2020 to May 2021, Defendant Tom Galligan ("Defendant Galligan") was the Interim President of Louisiana State University.

15.    At all times relevant to this complaint from May 2021 until the date of filing, Defendant William F. Tate, IV ("Defendant Tate") has been the President of Louisiana State University.

16.    Taken together, Defendants LSU Board, Alexander, Galligan, and Tate are referred to as the LSU Defendants.

17.    At all times relevant to this complaint, Defendant University of Louisiana Board of Supervisors ("Defendant Board of Supervisors") has been the governing body of the University of Louisiana at Lafayette ("Lafayette") and Louisiana Tech University ("Tech"), and had the authority to and did exercise control over Lafayette and Tech.

18.    At all times relevant to this complaint Defendant Joseph Savoie ("Defendant Savoie") has been the President of Lafayette.

19.    At all times relevant to this complaint, Defendant Les Guice ("Defendant Guice") has been the President of Tech.

20.    Taken together, Defendants Lafayette and Savoie are referred to as the Lafayette Defendants.

21.    Taken together, Defendants Tech and Guice are referred to as the Tech Defendants.

22.     At all times relevant to this complaint, Defendant Lafayette Consolidated Government has been an incorporated municipality located in Lafayette Parish, State of Louisiana.

During the relevant timeframe, Lafayette Police Department ("LPD") has been a municipal agency within Defendant Lafayette Consolidated Government, organized and existing pursuant to Louisiana law. As codified in Act 172, as a law enforcement entity, LPD, as an entity within Defendant Lafayette Consolidated Government, was responsible for coordinating and communicating with various post-secondary institutions about potential sexual assailants with the potential to cause harm on institutional campuses, and to institutional students and employees.

23.     During timeframes relevant to the complaint, Defendant Toby Aguillard was the Chief of Police for the Lafayette Police Department, and an authorized representative of Defendant Lafayette Consolidated Government.

24.     During timeframes relevant to the complaint, John/Jane Doe Chiefs of Police were serving as the operating Chiefs of Police for the Lafayette Police Department, and an authorized representative of Defendant Lafayette Consolidated Government.

25.     Taken together, the five Presidents, Aguillard, and John/Jane Doe Chiefs are referred to as the Individual Defendants.

26.     The Individual Defendants were acting in the course and scope of their employment at all times relevant to the allegations contained herein.

27.     Taken together, Defendants Board of Regents, LSU Board of Supervisors, and Board of Supervisors are referred to as the University Defendants.

## JURISDICTION AND VENUE

28.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

29.     This action is also brought to redress Plaintiff's constitutional rights pursuant to the 14th Amendment to the United States Constitution, 42 U.S.C. § 1983.

30.     Finally, this action arises pursuant to violation of Louisiana state law, and involves acts, omissions and/or conduct that occurred in the state of Louisiana including in Lafayette Parrish.

31.     Venue is proper in this division, as the acts and/or omissions complained of occurred in Lafayette Parish, which is located in this division and at least two of the named Defendants are situated in this division.

32.     Subject matter is proper in this division under 28 U.S.C. § 1331 because this action involves questions requiring the interpretation of the United States Constitution, and/or the laws and treaties of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

33.     Finally, Plaintiffs invoke and respectfully request that this court exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) to hear and decide the claims arising under state law, as their claims are so intertwined with the claims arising in that original jurisdiction of this court as to form part of the same case or controversy.

**GENERAL FACTUAL ALLEGATIONS**

*a.  Background: Act 172 and Policies Against Power-Based Violence*

34.     In February, 2015, the Louisiana general assembly adopted the Campus Accountability and Safety Act, Act 172 ("Act 172" or "The Act") of the regular legislative session.

35.     The Act was designed to ensure post-secondary institutions were creating and maintaining safe learning environments for students and those individuals participating in the institutions' activities and programs.

36.     Defendant Board of Regents was among the entities that developed the 2015 policy, including by assembling and consulting with national experts who advised on best practices "for providing statewide training opportunities to assist in uniform compliance." *Id.*

37.     Ultimately, the policy contained six critical mandates:

      i.     Prevention and awareness programs;

      ii.    Confidential advisors;

      iii.   Campus climate surveys;

      iv.    Coordination with local law enforcement;

      v.     Online reporting; and

      vi.    Institutional task forces.

38.     Defendant Board of Regents adopted this policy on February 23, 2015, which then became applicable to all Louisiana public post-secondary institutions including Defendants LSU, Lafayette and Tech.

39.     Yet six years later, it was clear the policy had failed, not because of its content, but because of a fundamental implementation failure by post-secondary schools and law enforcement.

40.     On March 23, 2021, Defendant Board of Regents released a letter to the Presidents of the state's four public post-secondary institution systems' Presidents and management board chairs.

41.     In the letter,[2] Defendant Board of Regents noted:

> More needs to be done to protect students enrolled at Louisiana's post-secondary institutions from sexual misconduct. Specifically, we all must ensure enforcement of all sexual misconduct and related policies, implement sexual misconduct and prevention programs, and provide support services for students who raise allegations of sexual misconduct. While the [Board of Regents] is committed to developing comprehensive policies, we must also ensure consistent and strong implementation, which is the **critical responsibility of management boards**. (emphasis added).

42.     As such, more than five years after its passage, in March, 2021, Defendant Board of Regents clearly expressed that it had failed with regard to Act 172, and that, in its estimation the University Defendants had also failed.

43.     Act 172 and its resultant statewide policy related to protecting against sexual misconduct by post-secondary institutions was intended to be co-extensive with the federal provisions in Title IX requiring safe learning environments, as well as the provisions of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") requiring disclosure of campus security policies and crime statistics.[3]

44.     Fundamentally, the policies were intended to protect against sex crimes on campuses, and involving college students, by requiring transparency and robust communication among and between universities as well as law enforcement.

---

[2] *See* Letter to Systems Requesting Information on Sexual Misconduct Reporting, LOUISIANA BOARD OF REGENTS (Mar. 23, 2021), http://regents.la.gov/wp-content/uploads/2021/03/Title-IX-Letter.pdf, attached as **Exhibit A**.
[3] *See* Regents Review Policy on Sexual Misconduct, LOUISIANA BOARD OF REGENTS (Mar. 24, 2021), https://regents.la.gov/regents-review-policy-on-sexual-misconduct, attached as **Exhibit E**.

45.     Act 172 required institutions, such as the universities named in this complaint, and law enforcement, including, without limitation, Defendant Lafayette Consolidated Government by and through LPD, Defendants LPD, Aguillard, and John/Jane Doe Chiefs, "to execute a memorandum of understanding whereby the parties would clearly delineate responsibilities and share information in accordance with applicable federal and state confidentiality laws[.]"

46.     In furtherance of these priorities, in 2015, each of the universities named in this complaint, as well as Defendant Board of Regents, created and/or amended policies specifically intended to combat "power-based violence" on their campuses.[4]

47.     Lafayette's policy expressly provided:

Pursuant to this policy, as well as federal and state law, [Defendant Lafayette] will provide an educational and working environment for its Employees and Students that is free from sexual harassment and other prohibited sexual conduct.[5]

48.     Lafayette's policy further provided:

Through this policy and the mandatory associated training required for all Employees and available training for students, the University seeks to:

Unequivocally state intolerance for prohibited sexual conduct;

Identify the Broad scope of such prohibited sexual conduct;

Establish an effective, unform reporting and investigative process;

Require prompt action to protect against recurrence and the Prohibited sexual conduct;

Ensure resolutions that impose appropriate remedies or sanctions;

Protect complainants, respondents, and individuals who report or are involved in the investigative process from harassment, reprisal, or retaliation; and

---

[4] *See* Memoranda in response to and prohibiting power-based violence on campus at LSU, Lafayette, and Tech, attached hereto as **Exhibits B**, **C** and **D**, and the Louisiana Board of Regents Uniform Policy on Sexual Misconduct, attached hereto as **Exhibit E**.
[5] *See* **Exhibit C**, at 1.

Respect confidentiality and the privacy rights of Employees and students to the greatest extent practicable and appropriate…[6]

49.    Likewise, under its policy against power-based violence, which has been in place since 2013, Tech espouses its intent to ensure all students receive equal access to education free from gender-based violence and harassment.[7]

50.    LSU also has a Permanent Memorandum against power-based violence. This policy promises to provide "an environment free from discrimination on the basis of sex, gender, and sexual misconduct. This policy affirms these principles and provides recourse for individuals whose rights have been violated."[8]

51.    By and through these policies, the universities affirmed their responsibility for protecting students against sexual misconduct and crime, including by appropriately identifying and monitoring known or alleged offenders.

52.    A foundational purpose for Act 172, and for the corresponding policies put in place by the universities, was to ensure that offenders or potential offenders did not avoid detection by transferring following allegations of sexual misconduct.

53.    Individual Defendants Alexander, Galligan, Tate, Savoie, and Guice, as the highest-ranking officers in their respective Universities, were responsible for the implementation and management of these policies. The failures of these institutions to implement any of the requirements of Act 172, codified in their policies against power-based violence, are therefore directly attributable to the Individual Defendants.

54.    In addition to the University Defendants' policies against sexual misconduct, in 2015 Defendant Board of Regents also adopted a Uniform Policy on Sexual Misconduct, which,

---

[6] *Id*. at 3.
[7] *See* Tech Policy, **Exhibit D**, at ¶ 1.3 Legal Summary.
[8] *See* LSU Permanent Memorandum, **Exhibit B** at 3, ¶ 1. Purpose and Commitment.

in part, was designed to mandate that each university answerable to Defendant Board of Regents would thereafter put in place an institutional policy, which would be applied and implemented in accordance with all federal and state laws and regulations.[9]

   b.  *System Failure: An offender goes undetected*

55.    By late 2014, the problem of violence against women in Louisiana had reached a crescendo.

56.    In a meeting to address the practice of billing rape victims for medical services, during which time the then-Executive of the Committee on Women and Children, Joey Watson, confirmed that law enforcement had been engaging in the improper practice of requiring rape victims to submit to polygraph examinations, Senator Karen Carter Peterson of New Orleans voiced her astonishment and disgust over what she saw as serious abuses of victims, stating to Watson:

> You are not the right person to lead this agency…[Y]ou don't know what the budget is, you don't know how to stop people from violating federal law, but yet you are over a law enforcement commission. You should not be making $87,000 a year and doing this job if you can't protect women…This is ridiculous. You should be embarrassed.[10]

57.    Act 172, in combination with an executive order passed by former Governor of Louisiana Bobby Jindal on September 26, 2014, was specifically designed to protect Louisiana sexual assault victims.

58.    Calling sexual assault a "heinous crime," Governor Jindal stated about his executive order, "we want to do everything we can to protect the victims of these terrible acts."[11]

---

[9] *See* Board of Regents Policy, **Exhibit E**, at ¶ II. Introduction.

[10] *See* Rebecca Catalanello, *Lawmakers target commission's role in overseeing state's compliance with federal rape laws*, The Times-Picayune (Oct. 21, 2014), available at https://www.nola.com/entertainment_life/health_fitness/article_c2d46380-95ec-5f3c-bd84-e844c50db1c2.html.

[11] *See* Rebecca Catalanello, *Jindal issues executive order aimed at providing better protection for rape victims*, The Times-Picayune (Jul. 19, 2019), available at https://www.nola.com/entertainment_life/health_fitness/article_71d3c22f-88b9-57dc-9115-020ab06feb4e.html.

59.     Thereafter, from September, 2014 through June, 2015, the Louisiana legislature passed at least four bills designed to assist victims of sexual assault, and further designed to prevent sexual assault where possible.

60.     Some of these bills, including Act 172, specifically contemplated assistance from the Board of Regents, and public universities.

61.     Yet, at the same time, Victor Silva made his way into Louisiana's public university system.

62.     In 2014, Victor Silva began his freshman year at Louisiana State University ("LSU").

63.     During Silva's freshman year, an initial victim reported Silva to Baton Rouge law enforcement for assault.

64.     Upon information and belief, law enforcement thereafter notified LSU of the report.

65.     Upon information and belief, despite knowledge of the allegations, LSU never properly instituted an investigation into the allegations, nor did LSU contact Silva's transferee school to notify the school about the allegations.

66.     Upon information and belief, LSU and the other institutional Defendants could have and should have shared the nature of the allegations against Silva with a transferee institution. These communications would have been authorized and condoned by FERPA.

67.     Instead, after his brief tenure at LSU, Victor Silva transferred without issue to Lafayette.

68.     Following his transfer to Lafayette, in April, 2015, Silva was arrested by LSU police on charges of sexual assault.

69.     The arrest was reported to Lafayette and to LSU.

70.     Upon information and belief, in an email related to "Title IX Updates," Silva was described by LSU as a "frequent flier." He was banned from the campus, but LSU and Lafayette did not communicate with each other about Silva, or the allegations of sexual assault piling up around him.

71.     Moreover, and upon information and belief, LSU failed to properly provide its student body with information about reporting Silva to his current university.

72.     Following the April 2015 allegations, Lafayette merely placed Silva on probation, ordering that he complete behavior management, but made no other monitoring or reporting requirements. While Silva was not accused of additional on-campus crimes, from 2015 through 2018, Silva was reported for sexual offenses to Lafayette Police Department on at least three other occasions.

73.     Lafayette Police Department did not report these instances to Lafayette.

74.     Upon information and belief, during this same timeframe, no employee of Lafayette followed up with law enforcement related to Victor Silva, or whether there had been any additional reports of sexual offenses involving University students.

75.     A fellow student from Lafayette was the source of at least one of the additional reports against Silva.

76.     Another report received by Lafayette Police Department was from a woman who stated she was blackmailed by Silva after they had a consensual sexual encounter. The complaint indicated Silva was pressuring the woman to send nude photographs and threatened to release a video of the two of them having sex if she refused to do so.

77.     Reports indicate an officer with Lafayette Police Department closed the case against Silva after Silva agreed to delete the photographs – but still the incident was not reported to Lafayette.

78.     In 2018, Lafayette received another report from a female student, who indicated that Silva assaulted her when the two were freshmen in high school.

79.     This report was the second 2018 report of sexual assault made by a Lafayette student against Silva.

80.     Under the Memorandum of Understanding between Lafayette and Lafayette Police Department, reports of these offenses should have been made to Lafayette – yet, upon information and belief, no such reports exist.

81.     Rather, the named universities and Defendants appear to have engaged in a process by which, rather than protecting victims, Silva was protected, not only against any internal investigation by any of the universities, but also against detection when he transferred among the University Defendants' campuses – an outcome contrary to Act 172 and the policies against sexual assault adopted by the named universities.

82.     Defendants allowed for this to occur by failing to appropriately, timely, or effectively implement mandatory programs consistent with Title IX and Act 172.

83.     Upon information and belief, Victor Silva was not the only offender who went undetected, or unprosecuted during the applicable timeframe.

84.     In 2018, Silva once again transferred, this time to Tech.

85.     Upon information and belief, Silva arrived at Tech with a clean record, without even a reflection of his prior probationary status with Lafayette, and with no mention of the issues from LSU.

14

86.     Less than two months after Silva transferred to Tech, a fellow student filed a report against Silva with Tech's Title IX office, accusing Silva of sexual assault. The report was referred to an external police department, which later declined to press charges. A week later, Tech notified the student it would not investigate her allegations.

87.     Silva withdrew from Tech three days after the allegations, and, according to a representative of Tech, because Silva had no pending disciplinary charges against him at the time of his withdraw, Tech declined to notify Silva's transferee institute of the allegations.

88.     Silva transferred back to Lafayette.

89.     In March, 2021, Husch Blackwell, an independent law firm retained by LSU to review LSU's Title IX policies and processes made several findings about LSU's deficiencies.[12]

90.     In its report, the law firm made the following recommendations:

    a.   The Title IX Office must be staffed appropriately;

    b.   Designate a Deputy Title IX Coordinator for Prevention and Training;

    c.   Designate a Deputy Title IX Coordinator for Support and Resources;

    d.   The Title IX Coordinator Reporting Line Must Change;

    e.   Implement Internal Monitoring and Quarterly and Annual Reporting;

    f.   Recordkeeping Must be Improved;

    g.   Targeted training for Athletics;

    h.   Mandatory Reporting Obligations Must be Clear;

    i.   Finalize the LSUPD MOU;

    j.   Title IX Personnel Must Get Specialized training on Dating and Domestic Violence;

---

[12] *See* Husch Blackwell, *Louisiana State University Title IX Review* (Mar. 3, 2021), available at https://lsu.edu/titleix-review/docs/4828-6651-7216_1_lsu_report-final.pdf ("Husch Blackwell Report").

    k.   Accountability is Critical;

    l.   Special Care is Warranted for Cases Involving Athletes;

    m.  Develop and Implement Alternative Resolution Options and Restorative Justice for Sex Discrimination Matters;

    n.   Implement Timelines for Resolutions and Options for Participants in Untimely Cases;

    o.   Thoughtfully Consider Presumptively Appropriate Sanctions;

    p.   The University Needs a New Centralized Website to Increase Understanding and Simplify the Process;

    q.   Regularly Measure Climate and Effectiveness;

    r.   The Rules Must Apply to Everyone.

91.    Remarkably, many of the 2021 recommendations surround issues that should have been addressed in response to Act 172, which was passed more than six years before the Husch Blackwell report.

92.    Upon information and belief, and as indicated in the Systems Letter from Defendant Board of Regents,[13] as of 2021, Lafayette and Tech suffered from the same deficiencies as LSU, which were enumerated in the Husch Blackwell report.

93.    Collectively, the failures of the Individual Defendants, Defendant Board of Regents, Defendant Board of Supervisors, Defendant LSU Board of Supervisors, and Defendant Lafayette Consolidated Government, to implement and enforce programs to address and prevent sexual violence against women created an environment on college campuses and throughout the

---

[13] *See* **Exhibit A**.

university system where predators, such as Victor Silva, were allowed to pass through undetected, all while expanding their web of victims.

## SPECIFIC FACTUAL ALLEGATIONS

*Plaintiff M.D.*

94.     In August, 2014, Plaintiff M.D. entered her freshman year as a student at LSU.

95.     During her first semester of freshman year, Plaintiff was successfully completing her classes.

96.     At the same time that Plaintiff M.D. started as a freshman, Victor Silva was also a freshman at LSU.

97.     Plaintiff M.D. met Victor Silva through friends, at the dining hall at LSU.

98.     During her second semester, in spring 2015, while at a university event hosted by an authorized fraternity of LSU, Plaintiff encountered Victor Silva.

99.     At the time, and upon information and belief, Victor Silva was no longer a student of LSU, having transferred due to allegations of sexual assault that had not been reported to his transferee institution.

100.     When Plaintiff encountered Silva, she had consumed one alcoholic drink.

101.     That night, Plaintiff was sexually assaulted by Silva at her dorm on campus. She had repeatedly said no to his advances, but he forced himself onto her.

102.     Following the assault, Plaintiff's grades began to fall drastically. She was unable to concentrate and would experience bouts of anxiety and depression.

103.     At some point during her second semester, Plaintiff M.D. was notified she was being placed on academic probation.

104.    Around the same timeframe, Plaintiff reported to her Title IX office that she had been sexually assaulted on-campus, and requested help from them, including access to mental health services.

105.    Not only did the office explicitly decline to pursue any genuine investigation of Silva, although they understood Silva had already been accused of sexual misconduct prior, they failed to provide her with the requested services.

106.    Instead, while an initial referral was made to LSU Police Department, the Title IX office essentially told Plaintiff to resolve the matter herself.

107.    At the end of her second semester, LSU expelled Plaintiff.

108.    LSU communicated to Plaintiff that the expulsion was due to poor academic performance. Yet LSU was aware of Victor Silva's sexual assault of Plaintiff M.D.

109.    At all times relevant to the complaint, LSU never offered to provide appropriate counseling or therapy for Plaintiff M.D. following her sexual assault.

110.    Furthermore, LSU failed to otherwise hold Victor Silva accountable for Plaintiff M.D.'s sexual assault. Silva was banned from campus, but Plaintiff M.D. was informed by LSU that Silva could still access the campus if he paid to attend events, such as sporting events.

111.    This lack of consideration for Plaintiff M.D.'s safety caused a significant increase in her anxiety. She was further concerned that LSU allowing Silva to continue to attend paid events meant they would not appropriately enforce any "ban."

112.    Instead, and upon information and belief, LSU used Plaintiff M.D.'s falling grades as a pretext to expel her when, in reality, the expulsion was in retaliation for reporting a sexual assault.

113.    Because of Silva's sexual assault, Plaintiff M.D. was diagnosed with post-traumatic stress disorder ("PTSD"), which she continues to struggle with to this day.

114.    This diagnosis and the resultant anxiety have followed Plaintiff M.D. into her adult and professional life.

115.    Plaintiff M.D. would not have been exposed to Silva had Act 172 been properly utilized by the higher education and criminal justice systems in Louisiana.

*Plaintiff P.P.*

116.    Plaintiff P.P. enrolled at the University of Louisiana ("UL") at Lafayette ("Lafayette") in 2016. Plaintiff P.P. was a chemical engineering student.

117.    Upon information and belief, Plaintiff P.P. first encountered Silva at Lafayette in 2019 during her junior year in a physical chemistry class.

118.    Plaintiff was aware of one other case concerning Silva through an acquaintance who was a sexual assault survivor. Upon information and belief, many people in the program had heard rumors of Silva's history of sexual abuse.

119.    One reason Plaintiff P.P. discounted the rumors about Silva was the lack of official action against him.

120.    Upon information and belief, other female engineering students made complaints to the then-head of the engineering department.

121.    Furthermore, upon information and belief, a UL psychology professor used Silva as a case study on serial rapists, demonstrating that UL had widespread knowledge of accusations against Silva.

122.    During her time as a student at UL, Silva persistently pursued Plaintiff, targeting locations and activities where Silva knew Plaintiff P.P. would be present.

19

123.    In May of 2020, she began dating him.

124.     Soon after, Plaintiff P.P. and Silva began living together.

125.    In summer 2020, Plaintiff P.P. received several messages from women previously involved with Silva and from one of Silva's male friends, informing her that Silva was dangerous. One of the women described Silva as a "monster."

126.    In early August 2020, Plaintiff P.P. and Silva spent time with Plaintiff P.P.'s friend, Jane Roe,[14] at the home of Plaintiff P.P.'s parents.

127.    One evening during that visit, Plaintiff P.P., Roe, and Silva consumed alcohol and went to bed separately.

128.    Roe woke up with Silva in her bed, groping her and pressing his erection against her.

129.    Roe told Plaintiff P.P. about the sexual assault, and Plaintiff P.P. confronted Silva about it.

130.    Silva appeared nervous to Plaintiff P.P. and tried to brush it off as an accident.

131.    Up to that point, Plaintiff P.P. had ignored other strange and alarming behaviors from Silva, such as saying inappropriate things and sending pictures to other girls.

132.    Silva would also alarm Plaintiff P.P. by getting angry and slamming doors.

133.    Once, Silva tried to drag Plaintiff P.P. down a flight of stairs.

134.    Silva also displayed jealous behaviors.

135.    Plaintiff P.P., as an engineer, works mostly with men. Silva baselessly accused Plaintiff P.P. of cheating on him on a business trip and would become enraged when she received messages from male coworkers.

---

[14] For privacy of a non-party, Jane Roe is a pseudonym.

136.   Throughout their relationship, Silva coerced Plaintiff P.P. into having sexual intercourse when she did not want to.

137.   Silva exhibited emotionally abusive behaviors towards Plaintiff P.P.: periods of kindness followed by periods of viciousness and relying on trauma bonding to engage victims.

138.   Upon information and belief, in August or September 2020, Silva once acknowledged that Plaintiff P.P. "was not into it" when they were intimate after having consumed alcohol; Plaintiff P.P. had passed out and does not remember consenting or having sexual relations with Silva.

139.   Plaintiff P.P. was shocked and thought of the other women assaulted by Silva, including her friend Jane Roe.

140.   Plaintiff P.P. also felt scared and wondered that if Silva was willing to share that fact with her, what else might he have done that he had not shared.

141.   Around January 2021, Plaintiff P.P. ended her relationship with Silva.

142.   Around February 2021, Plaintiff P.P. and Plaintiff J.B. connected and shared their experiences with each other.

143.   In March 2021, Plaintiff P.P. was contacted by reporter Kenny Jacoby of USA Today about the investigation he was conducting on Silva and the Louisiana higher education system.

144.   Throughout this time, Plaintiff P.P. kept in contact with Silva in order to be aware of his whereabouts and mindset.

145.   Plaintiff P.P. was afraid of Silva as Silva still had a key to her house, and, upon information and belief, had a history of stalking behavior.

146.    Plaintiff P.P. is still dealing with the emotional and economic impact of Silva's abuse.

147.    While they lived together, Plaintiff P.P. paid all of their bills. Plaintiff P.P. continued to subsidize Silva after he moved out.

148.    Plaintiff P.P. experienced severe depression following her breakup with Silva.

149.    Plaintiff P.P. has had mild anxiety since she was a teenager. Since her relationship with Silva, she has experienced an increase in anxiety to the point of needing medication, which she had never needed before.

150.    Plaintiff P.P. has been scared to be alone and scared to return home from work.

151.    Plaintiff P.P. has recurring nightmares about Silva.

152.    Additionally, Plaintiff P.P. experiences anxiety due to triggers associated with Silva, such as seeing men who look like him, men drinking alcohol, or men who exhibit personality traits like his.

153.    Plaintiff P.P.'s later romantic relationships have been negatively affected by Silva's abuse.

154.    Silva's abuse has affected Plaintiff P.P.'s ability to communicate and trust. For example, if she gets a message from a male friend and her current boyfriend asks about it, she becomes defensive and alarmed because of the harassment Silva put her through previously when she received messages from male coworkers or friends.

155.    Plaintiff P.P. has lost her sense of self due to Silva's abuse. She is unable to control her fears and anxieties, and she has been forced to relearn who she is.

156.    Plaintiff P.P. would not have been exposed to Silva had Act 172 been properly utilized by the higher education and criminal justice systems in Louisiana.

*Plaintiff J.B.*

135.    Plaintiff J.B. was an environmental safety manager at a private employer in Searcy, Arkansas, where she began working in November, 2020. The place of employment is a flexible packaging manufacturer, and Plaintiff J.B. was responsible for workplace safety.

136.    Upon information and belief, Silva began working at J.B.'s place of employment in late 2020 as a process engineer.

137.    Plaintiff J.B. is twelve years older than Silva.

138.    Plaintiff J.B. was responsible for training Silva on workplace protocols.

139.    During his training, Plaintiff J.B. and Silva made small talk, mostly discussing his time at Lafayette.

140.    Silva did not disclose any of the accusations against him, nor did he disclose that the was enrolled in and transferred from LSU and Tech.

141.    During his training and the beginning of his employment, Silva would often show up at Plaintiff J.B.'s office.

142.    Silva told Plaintiff J.B. that he was making excuses to go see her.

143.    Silva also began contacting Plaintiff J.B. over company messaging systems.

144.    Soon, Silva began to veer out of professional messages into personal messages. For example, Silva told Plaintiff J.B. that she should visit his apartment to try a new whiskey he bought.

145.    Silva was persistent in his pursuit of Plaintiff J.B. Silva asked Plaintiff J.B. on dates repeatedly while they were coworkers.

146.    Plaintiff J.B. took pity on Silva because Silva was awkward at work and was having trouble fitting into the insular Arkansas community.

147.    Plaintiff J.B. resigned from her job in the first week of February 2021 and began a new job later that month.

148.    Around this time in February 2021, Silva asked Plaintiff J.B. if he could take her out on Valentine's Day, and Plaintiff J.B. acquiesced, believing Silva would leave her alone if she finally relented and went on a date with him.

149.    Prior to their date, Silva made sexual innuendos to Plaintiff J.B. via text message.

150.    Plaintiff J.B. told Silva repeatedly that she would not have sex with him.

151.    On the evening of their date, Silva showed up to Plaintiff J.B.'s house late with multiple bottles of wine. By the time he arrived at her home, no restaurants were open.

152.    On information and belief, Silva drank a significant amount of alcohol that night. Plaintiff J.B. had two glasses of wine over the course of several hours, but she noticed that all the wine was gone the next morning.

153.    Plaintiff J.B. also noted how intent Silva was to drink heavily, and she thought it was strange that all of the wine was gone.

154.    Plaintiff J.B. is only five feet tall and her tolerance to alcohol is low.

155.    The next thing that Plaintiff J.B. remembers after having drinks with Silva is Silva kissing her and moving her to her bed. Plaintiff J.B. then dissociated and froze while Silva raped her.

156.    The next morning, Plaintiff J.B. told Silva that he did not have her consent to have sex.

157.    Silva dismissed her comment, telling her that he thought women "just wanted men to take it."

158.    Plaintiff J.B. then sent Silva home that morning, even though there was a blizzard.

159.    Following the rape, Plaintiff J.B. shut down. It was difficult for her to get up and go to work, and she did not clean her apartment for several months after.

160.    Although Plaintiff J.B. felt betrayed by Silva, Silva began to act remorseful, and Plaintiff J.B. continued to talk to him via text because she felt sorry for him as he was so young and alone in a place he did not feel comfortable.

161.    At one point, Plaintiff J.B. reminded Silva via text message that he did not have her consent that night.

162.    Silva's response was to ask Plaintiff J.B. if she had gone to the police.

163.    In around March 2021, Plaintiff J.B. met with Silva to go to a farmer's market.

164.    By the time they arrived, Plaintiff J.B. realized that Silva was drunk because he was loud and disruptive.

165.    At the farmer's market, Silva met another man from South America, and Silva told him that his name was Victor.

166.    Plaintiff J.B. was shocked to hear him say this.

167.    Silva had been going by Daniel in Arkansas, and Plaintiff J.B. only knew him as Daniel.

168.    Sometime around March, 2021, Silva began acting more strangely and was drinking more alcohol than usual.

169.    When Plaintiff J.B. asked about why he was behaving differently, Silva mentioned an upcoming news article about him.

170.    Upon hearing this, Plaintiff J.B. researched Silva on the internet using his other name ("Victor") and saw a Twitter thread from another of Silva's victims detailing his sexual abuse of others.

171.    Plaintiff J.B. had searched Silva on the internet before as "Daniel," and she had only found his LinkedIn profile.

172.    Plaintiff J.B. and Silva had some contentious text exchanges about his treatment of her and his lying about his history of being investigated for sexual assault.

173.    Plaintiff J.B. contacted the author of the Twitter thread and got contact information for Plaintiff P.P. Plaintiff J.B. then saw how similar her experiences were to Silva's other victims.

174.    For a period, Plaintiff J.B. and Silva did not communicate.

175.    On April 12, 2021, Plaintiff J.B. told a former coworker about Silva raping her.

176.    Plaintiff J.B. continues to deal with the emotional fallout of the rape.

177.    Ultimately, Plaintiff J.B. was forced to move not only out of her apartment, but to another city entirely, to try to escape the horrific memories of the rape and to accept a new job.

178.    Plaintiff J.B.'s new position is in a completely different industry because she could no longer tolerate the culture of her previous industry.

179.    To this day, Plaintiff J.B. experiences anxiety when she sees men who resemble Silva, or who are behaving in a manic way. She cannot engage with them and has to physically remove herself from their presence when she encounters them.

180.    Additionally, Plaintiff J.B. was diagnosed with complex post-traumatic stress disorder. Silva's rape exacerbated her symptoms, including depression and fatigue.

181.    If Act 172 were enforced properly, Silva would not have been employed at J.B.'s place of employment and Plaintiff J.B. would not have been put in harm's way.

## TIMELY FILING OF COMPLAINT

194.    As it relates to the conduct alleged in this complaint, Plaintiffs had no opportunity to know of the accruing harm, and could not have known of the harm, because of the intentional

26

and/or reckless actions, inactions, and omissions of the Defendants, including failing to abide by internal policies and procedures related to sexual violence and misconduct, failing to make mandatory reports, failing to undertake appropriate investigations, and failing to rigorously enforce rules related to sexual misconduct.

195.     Upon information and belief, Defendants undertook efforts to conceal their failures related to timely, effectively, and appropriately investigating, reporting, and following up, and to generally protect vulnerable students from harm. Defendants' actions made it impossible for Plaintiffs to know the danger they were in, or that Defendants could have prevented the harm but chose not to do so.

196.     Given the Defendants' conduct, it would be inequitable for Plaintiffs' claims to be barred by and limitations period, under the doctrine of *contra non valentem agree non currit prescriptio*, which translates to mean "no prescription runs against a person unable to bring an action."

197.     Moreover, in or around May 2022, an action was filed in this Court against certain of the Defendants related to Defendants' complicity and failures in preventing sexual misconduct and harm throughout the University system.[15] For the first time, and in explicit detail, this action provided information about Defendants' failures, which were precluded from discovery due to Defendants' conduct.

198.     In short, Plaintiffs – women who experienced sexual assault at the hands of a common perpetrator – could not have known of the Defendants' failures, which allowed Victor Silva to sexually assault an unknown number of women with abandon over the course of over six

---

[15] *See Jane Doe v. Bd. of Supervisors of the Univ. of La. Sys.*, No. 3:22-cv-00338 (M.D. La., filed May 25, 2022).

years, across multiple universities in the State of Louisiana, and in multiple states across the country.

## COUNT I: VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a)
### *Against Defendants Board of Regents, LSU Board of Supervisors, and the Board of Supervisors*

199.    Plaintiffs repeat and reallege the preceding paragraphs as though repeated verbatim herein.

200.    Plaintiffs allege violations of Title IX against Defendants due to their deliberate indifference to sex-based discrimination.

201.    Pursuant to 20 U.S.C. § 1681(a), "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…"

202.    Plaintiffs are "persons" protected under Title IX.

203.    At all times relevant to this complaint, the University Defendants received federal financial assistance for their programs and activities, and thus were governed and required to abide by the requisites of Title IX.

204.    Pursuant to Title IX, the University Defendants were required to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

205.    Title IX covers all programs and activities, and extends to sexual harassment and assault by employees, students, and third parties.

206.    As set forth herein, because of the failures of the University Defendants, Victor Silva was empowered, and enabled to launch a campaign of sexual harassment, assault, and intimidation of multiple women that spanned multiple years over several Louisiana college campuses and into the State of Arkansas.

28

207.    When faced with allegations about Silva that should have compelled investigative and corrective action, each of the University Defendants failed to initiate appropriate action, and instead insulated and protected the assailant from harm as opposed to his victims.

208.    The failures, acts, and omissions of the University Defendants, including, without limitation failing to investigate allegations of sexual assault, and misconduct; failing to report allegations of sexual assault and misconduct; and declining to appropriately address allegations of sexual assault and misconduct by affirmatively declining to open an investigation, created, fostered, and contributed to a system-wide failure where a known predator was allowed to matriculate on multiple campuses undetected, and was therein allowed to expand the scope of his predatory campaign.

209.    At the same time that Victor Silva was victimizing women on the University Defendants' campuses, these same entities knew of their obligations under Title IX and were publicly, by and through their own failures and silence, holding themselves out as compliant with Title IX by publicly presenting themselves as:

      a.    Having rigorous and public nondiscrimination and anti-harassment policies;

      b.    Maintaining robust grievance procedures designed to guide victims through the process and ensure prompt and minimally adequate investigation into reports of sexual assault and misconduct;

      c.    Coordinating with local law enforcement;

      d.    Coordinating amongst post-secondary institutions;

      e.    Requiring mandatory Title IX training for faculty and employees;

      f.    Making information about Title IX and the University Defendants' Title IX responsibilities publicly available for students; and

g.      Regularly reviewing Title IX policies and procedure and implementation of same.

210.    In addition, at the same time that Victor Silva was victimizing women on the University Defendants' campuses, these same entities knew that they were obligated by state law, Act 172 to cooperation amongst each other and with law enforcement to mitigate and prevent the very conduct they allowed – to prevent known sexual abusers from transferring among various Universities without detection.

211.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, physical and emotional injuries; loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; educational loss; economic loss; psychological damage; and loss of the ordinary pleasures of everyday life.

212.    Plaintiffs therefore seek a judgment for damages directly and proximately resulting from the conduct set forth herein, and for such additional damages as this court may determine.

### COUNT II: VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a)
**Deliberate Indifference**
*Against Defendants Board of Regents, LSU Board of Supervisors,*
*and the Board of Supervisors*

213.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

214.    At all times relevant to this complaint, the University Defendants were required to provide victims with access to appropriate officials and channels to report sexual assault and misconduct and were further required to conduct adequate investigations into claims of sexual misconduct.

215.    Moreover, pursuant to the University Defendants' own policies and procedures, the Individual Defendants were required to safeguard against sexual misconduct and assault on their

respective campuses and were further responsible for communicating with each other to prevent against a potential sexual assailant from transferring undetected among their campuses.

216.    As set forth herein, at all times relevant to this complaint, the University Defendants failed to provide Plaintiffs with adequate access to reporting mechanisms; failed to investigate and properly address actual reports of sexual misconduct and assault; and failed to communicate with each other about a potential sexual assailant, who was therefore empowered to move within and among the Individual Defendants' campuses and victimize more people. In fact, as it relates to at least one Plaintiff who reported Victor Silva to the Title IX Office at LSU, she was later informed that no investigation would go forward and was forced to leave the campus due to a severe decline in her academic performance following her sexual assault.

217.    Had the University Defendants appropriately enacted and implemented the Title IX and Act 172 policies and procedures to which they paid lip service, including implementing appropriate judicial processes, Victor Silva's conduct would not have been permitted to go unsanctioned, and would not have been perpetuated across multiple campuses and into another state over more than six years, and involving numerous victims.

218.    As previously set forth, the University Defendants had knowledge of Victor Silva's misconduct, or operated with a reckless disregard for Victor Silva's misconduct, including non-consensual touching, fondling, vaginal penetration, stalking, and other bodily harm caused to Plaintiffs.

219.    This misconduct, including non-consensual touching, fondling, vaginal penetration, and stalking constitute discrimination under Title IX.

220.    The University Defendants exercised control over Victor Silva and his access to victims through his enrollment with each of the University Defendants.

31

221.    The University Defendants received reports throughout Silva's tenure as a student of his sexual misconduct, and purposefully and consciously declined to investigate this misconduct, coordinate with other institutions related to this misconduct, or to otherwise hold Silva accountable for this misconduct, such that he was allowed to perpetuate his campaign of sexual abuse for years.

222.    The University Defendants failed to carry out their duties to investigate and take corrective action under Title IX following reports that Victor Silva was responsible for sexual assault and/or misconduct on the University Defendants' campuses.

223.    Similarly, the University Defendants, as the ultimate entities with control over the conduct of their campuses, failed to take any action to ensure appropriate enforcement of Title IX requirements during the operative timeframe.

224.    The University Defendants, individually and collectively, acted with deliberate indifference to known acts of sexual assault, abuse, and misconduct on the University Defendants' campuses, and involving students enrolled with each of the University Defendants in one or more of the following particulars:

   a.   Failing to report sexual assault to the appropriate law enforcement entities;

   b.   Failing to investigate Plaintiffs' reports of sexual assault and/or misconduct;

   c.   Failing to address Plaintiffs' reports of sexual assault and/or misconduct;

   d.   Failing to take corrective measures against a perpetrator of sexual assault and/or misconduct;

   e.   Failing to coordinate amongst the University Defendants related to a potential assailant;

f.  Engaging in systemic pressure and creating a hostile environment for Plaintiffs after they came forward with information about sexual misconduct against them;

g.  Failing to create safeguards to prevent sexual misconduct, to address sexual misconduct, and to prohibit the knowing transfer among universities of a sexual assailant;

h.  Failing to exercise appropriate supervisory control related to implementation of Title IX preventative and corrective measures on the University Defendants' campuses;

i.  Such additional particulars as may be revealed through discovery of this matter.

225.  The conduct set forth herein amounts to deliberate indifference as to the right of Plaintiffs to educational access and opportunities.

226.  The failures set forth herein directly and proximately resulted in harm to the Plaintiffs either through failing to investigate and correct sexual misconduct, allowing the continued perpetuation of sexual misconduct, or systemically pushing Plaintiffs' out of the University Defendants' system, while consciously protecting their assailant.

227.  As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, physical and emotional injuries; loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; educational loss; economic loss; psychological damage; and loss of the ordinary pleasures of everyday life.

228.  Plaintiffs therefore seek a judgment for damages directly and proximately resulting from the conduct set forth herein, and for such additional damages as this court may determine.

## COUNT III: VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a)
### Hostile Environment
*Against Defendants Board of Regents, LSU Board of Supervisors,*
*and the Board of Supervisors*

229.     Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

230.     Plaintiffs allege violations of Title IX against the University Defendants due to their cultivation and perpetuation of a sexually hostile environment.

231.     The University Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

232.     As female students seeking equal access to educational opportunities and benefits at the University Defendants' educational institutions, Plaintiffs were members of a protected class covered by Title IX.

233.     The conduct described previously in this Complaint, perpetuated by the University Defendants' employees, created an abusive and sexually hostile educational environment on the University Defendants' campuses that impeded and effectively denied Plaintiffs' equal access to educational opportunities and benefits.

234.     The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the University Defendants, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to the University Defendants' educational opportunities and benefits.

235.     The University Defendants are liable for the abusive and hostile educational environment on campus because they had actual knowledge of the Plaintiffs' abuser's acts of sex-based discrimination against female students but allowed him to continue to have unfettered access to these students, including Plaintiffs.

34

236.     The University Defendants are also liable for their failure to remedy the hostile educational environment experienced by Plaintiffs by failing to offer appropriate interim measures and accommodations that could have provided equal access to educational opportunities and benefits and failing to remedy known sexually hostile environments.

237.     As a direct and proximate result of the University Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, physical and emotional injuries; loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; educational loss; economic loss; psychological damage; and loss of the ordinary pleasures of everyday life.

238.     Plaintiffs therefore seek a judgment for damages directly and proximately resulting from the conduct set forth herein, and for such additional damages as this court may determine.

### COUNT IV: VIOLATION OF 42 U.S.C. § 1983 AND THE 14TH AMENDMENT
### SUBSTANTIVE AND PROCEDURAL DUE PROCESS
*Against Individual Defendants Savoie, Guice,*
*Alexander, Galligan, and Tate*

239.     Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

240.     Plaintiffs allege violations of 42 U.S.C. § 1983 against Defendants Savoie, Alexander, Galligan, and Tate in their individual capacities due to deprivation of their property and liberty interests without adequate notice or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

241.     All Defendants are state actors and at all relevant times were acting under color of law.

242.     The 14th Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1.

243.     At all times relevant to this complaint, the 14th Amendment of the United States Constitutions has protected an individual's right to be free from governmental action that "shocks the conscious" and deprives a person of judicial protection to redress wrongful governmental conduct.

244.     In addition, the 14th Amendment protects an individual's right to security and safety in their bodily integrity.

245.     The 14th Amendment also operates to prevent a person from enduring bodily harm imposed by governmental entities, and from being foreclosed against seeking redress for that harm.

246.     As university presidents, Defendants Savoie, Guice, Alexander, Galligan, and Tate were responsible for oversight of their universities and ensuring that the University Defendants' institutions complied with their legal obligations.

247.     At all times relevant to this complaint, Defendants Savoie, Guice, Alexander, Galligan, and Tate had a duty to prevent sexual assault and/or misconduct on their campuses, as well as among and by their students and employees.

248.     At all times relevant to this complaint, the University Defendants had policies in place related to the prevention, detection, and correction of sexual assault and misconduct, and Defendants Savoie, Guice, Alexander, Galligan, and Tate, as the highest-ranking members of each of these entities, were responsible for enforcement of these policies and procedures. The failure of Defendants Savoie, Guice, Alexander, Galligan, and Tate regarding these policies and procedures amounts to deliberate indifference and the complete absence of care.

249.     Defendants Savoie, Guice, Alexander, Galligan, and Tate's failure to comply with the administrative requirements of Title IX and their own Title IX policies deprived Plaintiffs of their substantive due process rights to liberty, property, and bodily integrity.

250.     Defendants Savoie, Guice, Alexander, Galligan, and Tate's failure to comply with the administrative requirements of Title IX and their institutions' own Title IX policies deprived Plaintiffs of their procedural due process right to be heard prior to deprivation of their rights to liberty, property, and bodily integrity.

251.     Reasonable officials in Defendants Savoie, Guice, Alexander, Galligan, and Tate's positions would have known of Plaintiffs' right to due process under the law.

252.     Defendants Savoie, Guice, Alexander, Galligan, and Tate, knew or should have known of a predator moving amongst their midst or the impetus behind the constitutional deprivations suffered by the Plaintiffs, based upon Defendants Savoie, Guice, Alexander, Galligan, and Tate's failures to train, report, supervise, investigate, coordinate, notify law enforcement, or otherwise act in response to reports of Silva's conduct.

253.     Defendants Savoie, Guice, Alexander, Galligan, and Tate's actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[16]

254.     Defendants Savoie, Guice, Alexander, Galligan, and Tate's failures have created an unknown number of victims of sexual assault perpetrated by Victor Silva.

255.     These failures and the harm shock the conscience.

256.     As a direct and proximate result of Defendants Savoie, Guice, Alexander, Galligan, and Tate's acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, physical and emotional injuries, loss of their fundamental constitutional rights,

---

[16] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

economic loss, mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment, educational loss, economic loss, psychological damage, and loss of the ordinary pleasures of everyday life.

257.    As such, Defendants Savoie, Guice, Alexander, Galligan, and Tate are liable to Plaintiffs for deprivations of Plaintiffs' Constitutional rights to due process and bodily integrity.

**COUNT V: VIOLATION OF 42 U.S.C. § 1983**
**CUSTOM AND POLICY/ PATTERN OR PRACTICE IN VIOLATION OF DUE PROCESS AND EQUAL PROTECTION UNDER THE LAW**

258.    ***Against Defendant Lafayette Consolidated Government Aguillard and John/Jane Doe Chiefs***Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

259.    At all times relevant to this complaint, Defendants Aguillard and John/Jane Doe Chiefs were the Chiefs of Police ("Defendant Chiefs") for Lafayette Police Department and the highest-ranking officers of the Department, acting under color of state law.

260.    At all times relevant to this complaint, Defendant Lafayette Consolidated Government was the entity overseeing and responsible for the Lafayette Police Department and its officers, acting under color of state law.

261.    Under the 14th Amendment to the United States Constitution, at all times relevant to this complaint, Plaintiffs had a substantive right to be free from the risk of serious bodily injury or harm created by or increased by an affirmative act of the State.

262.    Pursuant to the 14th Amendment, the state is precluded from interfering with due process and equal protection under the law.

263.    As set forth herein and above, at all times relevant to this complaint, Defendants Lafayette Consolidated Government, Aguillard, and the John/Jane Doe Chiefs developed and

maintained customs and policies and/or a pattern and practices that exhibited deliberate indifference to the constitutional rights of persons such as Plaintiffs, who were specifically identified as requiring protection under Act 172.  The systemic deprivation of rights constituted a widespread pattern of conduct, of which Defendants Lafayette Consolidated Government, Aguillard, and the John/Jane Doe Chiefs had personal and intimate knowledge, and these were obvious, flagrant, rampant and not isolated occurrences.

264.    Defendants Lafayette Consolidated Government, Aguillard and the John/Jane Doe Chiefs maintained a custom and policy and/or pattern and practice of failing to adequately implement, monitor, or enforce policies, practices, guidelines, and other measures related to Act 172, and specifically authorized and allowed Victor Silva to repeatedly and habitually perpetuate crimes against new victims. These same failures constituted violations of Plaintiffs' rights to equal protection of the law.

265.    Upon information and belief, Defendants Lafayette Consolidated Government and Aguillard and the John/jane Doe Chiefs enabled and authorized these systemic failures by failing to adequately and properly train, retrain, supervise, and discipline officers, and failing to conduct fair and impartial investigations of complaints of police misconduct, as well as in failing to ensure adequate enforcement of Act 172.

266.    For instance, Defendant Lafayette Consolidated Government has had a history of complaints against its officers related to allegations of Constitutional deprivations, and allegations of failure to discipline, correct misconduct, or properly train and/or supervise officers.

267.    Moreover, during the relevant timeframe, and upon information and belief Defendant Aguillard and/or Defendants John/Jane Doe Chiefs were the highest ranking officers

within the Sheriff's Department and were aware of significant reports of misconduct and failures, including related to Act 172, of various of the deputies under their governance and control.

268.    Defendants Lafayette Consolidated Government, and Defendants Aguillard and the John/Jane Doe Chiefs either ignored or endorsed failures associated with Act 172 through its conduct and public statements as well as a lack of investigation and internal remediation.

269.    As it relates to Victor Silva, and as set forth herein, on at least four occasions, members of Defendants Lafayette Consolidated Government, Aguillard, and the John.Jane Doe Chiefs failed to properly apply Act 172, failed to follow the processes and procedures required under the Memorandum of Understanding entered into with the University Defendants, and otherwise failed to protect and/or ratified Silva's conduct by Defendant's failures.

270. This conduct demonstrates a perpetual and deliberate indifference to the constitutional rights of persons in the community, including, Plaintiffs, whose constitutional rights to due process and equal protection were guaranteed under the 14th Amendment of the United States Constitution.

271.    As the parties ultimately responsible for the actions of the Lafayette Police Department, and for the Sherriff's Office, Defendants Lafayette Consolidated Government, Aguilar, and the John/Jane Doe Plaintiffs, respectively, failed to investigate and/or reprimand such behavior and failed to discharge officers for their misconduct thereby ratifying misconduct, resulting in a deliberate indifference to Plaintiffs' constitutional rights.

272.    Defendants Lafayette Consolidated Government, Aguilar and the John/Jane Doe Chiefs maintained a policy and custom and/or pattern or practice of failing to properly train officers, including but not limited to, specific implementation of Act 172, how to properly assess allegations of sexual misconduct, the process by which sexual misconduct was to be reported,

investigated, and monitored, and application of due process of law. Defendants' failures, enunciated herein and above, directly and proximately deprived Plaintiffs' of equal protection of the laws.

273.    Defendant Lafayette Consolidated Government's, and Defendant Aguilar and the John and Jane Doe Chief's repeated and blatant failures related to Victor Silva, including the repeated violations of Memoranda of Understanding with public post-secondary institutions denied Plaintiffs' access to equal protection of the law.

274.    The acts and misconduct by Lafayette Police Department officers, were ratified, perpetuated, tolerated and not reprimanded by Defendant    Lafayette Consolidated Government. As such, Defendant encouraged constitutional violations perpetrated by officers.

275.    By and through their polices, practices, and customs, Defendant Lafayette Consolidated Government fostered an environment where officers believed that their misconduct would not be subject to monitoring by supervisors, would not be subject to proper investigations, and would not lead to any officer sanction or discipline.

276.    Defendant Lafayette Consolidated Government knew or had reason to know that officers, employees, and/or representatives of the Lafayette Police Department were engaging in conduct in violation of Plaintiffs' rights to due process and equal protection under the laws or that the officers of the Lafayette Police Department had customs and policies and/or patterns and practices of violating citizens' constitutional rights to equal protection, including through numerous failures to abide by Act 172, failure to properly train and supervise officers, failure to conduct fair and impartial investigations, covering up officers' misconduct, and failure to terminate officers who violated citizens' constitutional rights.

277.    During the interim of Silva's tenure and thereafter, Defendant Lafayette Consolidated Government still empowered and employed as Sheriff's and deputies individuals who, upon information and belief, have never been disciplined for their conduct related to Victor Silva and other sexual assailants, including for inadequate, improper, or otherwise deficient investigation practices, and failures to abide by or to implement Act 172.

278.    Upon information and belief, Defendants Aguillard and the John and Jane Doe Chiefs were never made aware of how to properly assess levels of threat, how to investigate allegations of sexual assault and misconduct following the introduction and passage of Act 172, or the role law enforcement was to play under Act 172, or, in the event of such training, said training was inadequate.

279.    As set forth in this complaint, and demonstrated by the numerous instances where officers, agents, and representatives of the Lafayette Police Department failed to appropriately or adequately police reports of sexual violence and misconduct, and specifically reports against Silva, in direct contravention to Act 172, and the Memoranda of Understanding between the Department and post-secondary institutions, Defendant Lafayette Consolidated Government has a widespread and notorious pattern and practice and/or custom and policy of unconstitutional conduct which has been ratified, and which, has exposed the deliberate indifference of Defendant Lafayette Consolidated Government to the constitutional rights of sexual abuse and assault victims, including Plaintiffs.

280.    Defendant's numerous failures, actions and inactions that perpetuated and ratified unconstitutional policing actually and proximately caused the violation of Plaintiffs' established and constitutionally guaranteed rights.

281.     As set forth herein, and with respect to the harm perpetuated upon Plaintiffs, Defendants Lafayette Consolidated and Defendant Chiefs violated each of the Plaintiffs' rights to due process and equal protection under the law by failing to appropriately investigate a potential serial sexual offender who was enrolled as a student at the University Defendants' institutions.

282.     More specifically, Defendants Lafayette Consolidated Government, and Defendant Chiefs failed in numerous particulars, including, without limitation:

    a.   On multiple occasions, halting and/or deciding against pursuing an investigation into allegations of sexual misconduct against Victor Silva;

    b.   Allowing Victor Silva to avoid criminal charges when Silva was engaged in blackmailing a woman through the threat of disclosing nude photographs of her;

    c.   Failing to abide by their affirmative obligations under Memoranda of Understanding with the University Defendants, overseen by the Individual Defendants; and

    d.   Concealing knowledge about Victor Silva's sexual misconduct.

283.     Defendants Lafayette Consolidated Government and Defendant Chiefs knew or should have known that their conduct would place Plaintiffs, and those similarly situated at an increased risk of harm. Specifically, Victor Silva had a known proclivity for taking advantage of women, particularly women who had consumed alcohol, and further that Silva was known for repeatedly forcing himself on women sexually without their consent.

284.     Defendants Lafayette Consolidated Government, and Defendant Chiefs objectively acted in a manner to permit, condone, and promote Silva's access to more victims.

285.     As a direct and proximate result of Defendants Lafayette Consolidated Government and Defendant Chiefs' acts and omissions, Plaintiffs have sustained injuries and damages,

including, but not limited to, physical and emotional injuries; loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; educational loss; economic loss; psychological damage; loss of the ordinary pleasures of everyday life; and were so egregious so as to shock the conscience.

286.    As such, Defendants Lafayette Consolidated Government, and Defendant Chiefs are liable to Plaintiffs for deprivations of Plaintiffs' Constitutional right to due process and equal protection under the law.

**COUNT VI: VIOLATION OF 42 U.S.C. § 1983**
**FAILURE TO TRAIN AND SUPERVISE**
*Against Defendants Lafayette Consolidated Government, Aguillar,*
*and John/Jane Doe Chiefs*

287.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

288.    At all times relevant to this complaint, Defendants Aguillar and John/Jane Doe Chiefs were   either a municipal organization within Defendant Lafayette Consolidated Government, or the highest-ranking officers of the Lafayette Police Department, acting under color of state law.

289.    At all times relevant, Defendants Lafayette Consolidated Government, and Defendant Chiefs had a duty to properly train, supervise, and discipline their employees and agents to ensure those employees' compliance with all applicable statutes, laws, and regulations.

290.    Under the 14th Amendment to the United States Constitution, at all times relevant to this complaint, Plaintiffs had a substantive right to be free from the risk of serious bodily injury or harm created by or increased by an affirmative act of the State.

291.    Pursuant to the 14th Amendment, the state is precluded not only from inflicting harm itself, but also from taking affirmative acts that directly increase the likelihood of harm perpetuated by third parties.

44

292.     As set forth herein, and with respect to the harm perpetuated upon Plaintiffs, Defendants Lafayette Consolidated Government, and Defendant Chiefs created and increased the likelihood of harm to each of the Plaintiffs by failing to appropriately investigate a potential serial sexual offender who was enrolled as a student of the University Defendants' institutions.

293.     More specifically, Defendants Lafayette Consolidated Government, and Defendant Chiefs failed in numerous particulars, including, without limitation:

a.   On multiple occasions halting and/or deciding against pursuing an investigation into allegations of sexual misconduct against Victor Silva;

b.   Allowing Victor Silva to avoid criminal charges when Silva was engaged in blackmailing a woman through the threat of disclosing nude photographs of her;

c.   Failing to abide by their affirmative obligations under Memoranda of Understanding with the University Defendants, overseen by the Individual Defendants; and

d.   Concealing knowledge about Victor Silva's sexual misconduct.

294.     Defendants Lafayette Consolidated Government, and Defendant Chiefs' affirmative acts created and/or increased the risk that Plaintiffs would be exposed to sexual violence at the hands of Victor Silva.

295.     Defendants Lafayette Consolidated Government, and Defendant Chiefs' conduct created a special danger to Plaintiffs by placing Plaintiffs at an increased risk for the exact harm that was eventually perpetrated against them.

296.     Defendants Lafayette Consolidated Government, and Defendant Chiefs knew or should have known that their conduct would place Plaintiffs, and those similarly situated at an increased risk of harm. Specifically, Victor Silva had a known proclivity for taking advantage of

women, particularly women who had consumed alcohol, and further that Silva was known for repeatedly forcing himself on women without their consent.

297.    Defendants Lafayette Consolidated Government, and Defendant Chiefs objectively acted in a manner to permit, condone, and promote Silva's access to more victims.

298.    Defendants Lafayette Consolidated Government, and Defendant Chiefs' actions, which enabled Victor Silva to continue this campaign of sexual assault across multiple college campuses, caused Plaintiffs serious and devastating violations of their bodily integrity; significant and permanent bodily, emotional, and financial harm; and were so egregious as to shock the conscience.

299.    As a direct and proximate result of Defendants Lafayette Consolidated Government, and Defendant Chiefs' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, physical and emotional injuries; loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; educational loss; economic loss; psychological damage; and loss of the ordinary pleasures of everyday life.

300.    As such, Defendants Lafayette Consolidated Government and Defendant Chiefs are liable to Plaintiffs for deprivations of Plaintiffs' Constitutional rights to be free from state-sponsored bodily harm.

## JURY TRIAL DEMAND

301.    Pursuant to the factual allegations and causes of action set forth herein, Plaintiffs demand a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, in their collective and/or individual capacities, and jointly and/or severally, and further pray for an award of damages including all such compensatory and/or consequential damages in an amount to be determined at trial, as well as for an award of attorney's fees and reasonable costs and for such other relief in law or equity as this Court deems proper.

Respectfully this 4th  day of November, 2022.

**DORAN & CAWTHORNE, PLLC**

*s/ Pride Doran*
Pride J. Doren (#25035)
Nahshon J. Route (#37848)
521 E. Landry Street (70570)
Post Office Box 2119
Opelousas, LA 70571
Phone: (337) 948-8008
Fax: (337) 948-0098
Email: pride@doranlawfirm.com
            nahshon@doranlawfirm.com

*Attorneys for the Plaintiffs*